IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH R. PERKINS, JR., | ) | CASE NO.  1:20-CV-01709-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Kenneth Perkins, Jr. ("Plaintiff" or "Perkins"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED IN PART AND VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION IN PART.

## I.    PROCEDURAL HISTORY

In January 2018, Perkins filed an application for SSI alleging a disability onset date of May 1, 2016[2] and claiming he was disabled due to bipolar disorder and schizophrenia.  (Transcript ("Tr.") at 15, 82, 97.)  The applications were denied initially and upon reconsideration, and Perkins requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

[2] Under 20 C.F.R. § 416.335, SSI benefits are payable as of the month following the month of application. Therefore, the period at issue begins on January 22, 2018, the date of application, regardless of the alleged onset date.

On May 2, 2019, an ALJ held a hearing, during which Perkins, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On June 10, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-29.)  The ALJ's decision became final on June 9, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On August 3, 2020, Perkins filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16-17.)  Perkins asserts the following assignment of error:

> (1) The ALJ's decision that Mr. Perkins' schizoaffective disorder bipolar type did not meet the requirements of paragraph 'C' of Listings 12.03 and 12.04 was not supported by substantial evidence.

(Doc. No. 14 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Perkins was born in June 1977 and was 41 years-old at the time of his administrative hearing (Tr. 15, 28), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c). He has a limited education and is able to communicate in English.  (Tr. 28.)  He has no past relevant work. (*Id.*)

### B.    Relevant Medical Evidence[3]

Perkins began treating at Recovery Resources in April 2016.  (Tr. 352.)  His diagnoses included schizoaffective disorder, bipolar type; schizophrenia; and drug disorders.  (*Id.* at 357.)   Throughout 2016, Perkins relied on case manager Tiffany Haddon for transportation to and from appointments and to the food bank, completing an application for housing at Recovery Resources and an application for Social

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  In addition, as Perkins challenges only the ALJ's findings regarding his mental limitations, the Court's discussion of the evidence is further limited to his mental impairments.

Security disability benefits, getting his medication, resolving issues with his pharmacy, and even transportation to the hospital after being off his medication for a few weeks and hearing voices.  (*Id.* at 424-25, 457-68.)

In April 2017, Haddon informed Perkins he had been selected for a unit at Franklin House, supportive housing through Recovery Resources.  (*Id.* at 435-36.)  *See also* Recovery Resources, https://www.recres.org/Housing (last visited Sept. 2, 2021).

In June 2017, Perkins underwent an assessment by Gretchen Bishop, Agency Clinician at Recovery Resources, to create an integrated treatment plan for the MICA Intensive Outpatient Program ("IOP").  (*Id.* at 413-15.)  Perkins was to attend IOP sessions four days a week for three hours each day, in addition to separate counseling sessions with his therapist.  (*Id.* at 415.)  Perkins missed multiple IOP sessions and was eventually terminated from the program.  (*Id.* at 415, 417, 421, 423-24.)  However, Perkins continued to receive other services through Recovery Resources throughout 2017.  (*Id.* at 407-13, 427-48.)  Case manager Haddon continued to provide Perkins with transportation to appointments, assistance with problems stemming from Perkins' behavior in his supportive housing placement, including issues in getting along with his roommates and other residents, and assistance in remaining on his medication.  (*Id.*)

On March 16, 2018, Perkins met with Haddon and reported other residents at Franklin House were "lying on him about suspected drug activity."  (*Id.* at 609-10.)  Perkins said he had been talking to the building monitor more often about things happening in the building.  (*Id.* at 610.)  Haddon noted Perkins presented as stable and that he reported "doing well overall."  (*Id.*)  That same day, Haddon noted, "Client is able to manage his affairs with little support when medication is stabilized but has a history of not being able to manage medication without supports."  (*Id.* at 614.)

3

On April 26, 2018, Perkins met with Haddon and he reported he was taking his medication as prescribed and was doing well.  (*Id.* at 599-600.)  Haddon reminded Perkins he had missed his last doctor's appointment and his medications could not be prescribed if he was not seen.  (*Id.* at 600.)  Perkins asked Haddon to send him a bus ticket to make sure he made it to his next appointment.  (*Id.*)  Haddon noted Perkins presented as stable.  (*Id.*)

On May 29, 2018, Haddon called Perkins to remind him of his upcoming medication management appointment.  (*Id.* at 601-02.)  Perkins reported he was doing well but he was almost out of medication.  (*Id.* at 602.)  Haddon noted the agency would arrange for transportation to his appointment.  (*Id.*)

On May 31, 2018, Perkins saw Christina Delos Reyes, M.D., for medication management.  (*Id.* at 705-10.)  Dr. Delos Reyes noted Perkins had missed multiple appointments and that the record showed Perkins had been off medication since the end of March, although Perkins insisted he had been taking it up until a few weeks ago.  (*Id.* at 706.)  Perkins reported his hallucinations were "somewhat under control." (*Id.*)  He had missed appointments because of a lack of transportation.  (*Id.*)  Perkins reported a relapse after the suicide of a family member.  (*Id.*)  On examination, Dr. Delos Reyes found Perkins well-groomed and fully oriented with normal language, attention, and concentration, appropriate fund of knowledge, auditory hallucinations, fluent speech, intact memory, constricted affect, euthymic mood, fair insight and judgment, spontaneous thought process, and normal associations and thought content.  (*Id.* at 707-08.)  Dr. Delos Reyes noted Perkins appeared "to be better from last visitation" although he had missed multiple appointments in between and there was a discrepancy between Perkins' medication refills and his claims regarding taking his medication.  (*Id.* at 709.)  Dr. Delos Reyes found less loosely associated thought and less psychotic thought even though Perkins had been off his medication for the last few weeks.  (*Id.*)

On June 25, 2018, Haddon called Perkins for his monthly mental health check in.  (*Id.* at 607-08.)  Perkins reported he had made it to his medication management appointment and had picked up his

prescriptions.  (*Id.* at 608.)  Perkins requested a bus ticket for his next appointment.  (*Id.*)  Haddon noted Perkins appeared stable over the telephone.  (*Id.*)

On July 12, 2018, Haddon picked up Perkins and transported him to his medication management appointment.  (*Id.* at 649.)  Haddon noted Perkins needed "supports to attend medsom appointments." (*Id.*)  During the car ride, Perkins told Haddon about issues he was having with his girlfriend.  (*Id.* at 650.) Haddon noted Perkins presented as stable and reported things were "'okay.'"  (*Id.*)

During his medication management appointment that day, Perkins reported he was taking his medication regularly.  (*Id.* at 711-12.)  On examination, Dr. Delos Reyes found Perkins well-groomed and fully oriented with normal language, attention, and concentration, appropriate fund of knowledge, fluent speech, intact memory, broad affect, euthymic mood, good insight and judgment, spontaneous thought process, and normal associations and thought content.  (*Id.* at 713-14.)  Dr. Delos Reyes noted Perkins appeared "to be better from last visitation" and Perkins demonstrated less loose associations.  (*Id.* at 715.) Dr. Delos Reyes also found Perkins' thought process seemed better and more stable on Risperdal.  (*Id.*) Dr. Delos Reyes discussed the importance of Perkins continuing to take his medication.  (*Id.*)

On August 10, 2018, Mobile Crisis reported that on August 8, the unit had received a call saying Perkins was walking down East 91st barefoot and carrying his shoes.  (*Id.* at 737.)  Perkins reported hearing voices, felt that he wanted to hurt people, and wanted to go to the hospital.  (*Id.*)  The unit noted that while on the phone with Perkins, Perkins was shouting at others and hearing voices telling him to hurt people.  (*Id.*)  When the police arrived, they could not find Perkins.  (*Id.*)  The following day, Mobile Crisis reached out to Perkins.  (*Id.*)  Perkins reported he was "good," he denied homicidal thoughts, and said he was taking his medication again.  (*Id.*)

On August 13, 2018, Perkins called Haddon to tell her he was at Lutheran Hospital for homicidal ideation.  (*Id.* at 615.)  Haddon provided emergency department staff with contact information in the event

Perkins was admitted.  (*Id.* at 616.)  During his hospital stay, treatment providers put Perkins back on Risperdal and Buspar.  (*Id.* at 747.)  When Perkins was discharged on August 15, 2018, treatment providers noted Perkins was stable at discharge.  (*Id.*)

On August 22, 2018, Hadden spoke with a Lutheran Hospital nurse regarding Perkins.  (*Id.* at 617-18.)  The nurse informed Haddon Perkins had been assessed and discharged; while Perkins was "agitated," the psychiatric doctor on call felt it was best for Perkins to attend his appointment at the agency.  (*Id.* at 618.)

The next day, Ms. Hadden met with Perkins and noted he "need[ed] supports to attend nursing appt following hospitalization."  (*Id.* at 653.)  She noted Perkins was frustrated and he reported he was angry that he had been accused of stealing a television from another resident.  (*Id.* at 654.)  Perkins relayed that he thought he was going to get evicted.  (*Id.*)  Perkins reported the reason for his hospitalization was that he was hearing voices telling him to hurt others.  (*Id.*)

On September 7, 2018, Perkins saw Mehgan Miller for assessment after testing positive for substances through supportive housing.  (*Id.* at 680.)  Perkins reported he had relapsed after someone he knew passed away about a month before.  (*Id.*)  Perkins wanted to get into an IOP program.  (*Id.*)  Perkins reported he had suicidal thoughts a few weeks ago and had called Mobile Crisis.  (*Id.* at 682.)  Perkins reported he went to Lutheran Hospital and was admitted to University Hospital overnight with thoughts of stabbing himself.  (*Id.*)  Perkins endorsed all but three symptoms of bipolar disorder and all but one symptom of schizoaffective disorder.  (*Id.* at 682-83.)  On examination, Miller found Perkins well-groomed, with average eye contact, clear speech, auditory and visual hallucinations, euthymic affect, cooperative behavior, and fair insight/judgment.  (*Id.* at 690.)  Miller recommended Perkins participate in the MICA IOP.  (*Id.* at 692.)

On September 13, 2018, Perkins saw Dr. Delos Reyes for medication management.  (*Id.* at 717.)
Perkins reported he had been sober since his hospital admission.  (*Id.* at 718.)  On examination, Dr. Delos
Reyes found Perkins well-groomed and fully oriented with normal language, attention, and concentration,
appropriate fund of knowledge, fluent speech, intact memory, constricted affect, euthymic mood, good
insight and judgment, spontaneous thought process, and normal associations and thought content.  (*Id.* at
719-20.)   Dr. Delos Reyes noted Perkins appeared "to be better from last visitation" and Perkins
demonstrated less loose associations and less psychosis on Risperdal.  (*Id.* at 721.)

Faith Mascol drove Perkins home from his medication management appointment that day.  (*Id.* at
647.)  Perkins reported he was "doing 'great'" and "that as long as he does what he is supposed to do and
stays on his meds he will be OK."  (*Id.* at 648.)

On October 4, 2018, Perkins spoke with Haddon after missing his IOP orientation.  (*Id.* at 621.)
Perkins reported he was confused and thought his start date was the following week.  (*Id.* at 622.)

On October 15, 2018, Perkins called Haddon to complain about an issue at Franklin House.  (*Id.* at
623.)  Perkins reported another resident knocked loudly on his door after 11 p.m. and then walked away.
(*Id.* at 624.)  Perkins stated he went to the other resident's apartment to ask what was wrong and the other
resident acted like he did not know what Perkins was talking about.  (*Id.*)  Perkins acknowledged the other
resident may have been drunk and stated he was going to discuss with his family what he should do next.
(*Id.*)

On October 24, 2018, Haddon met with Perkins regarding updating his treatment plan.  (*Id.* at
665.)  Haddon found Perkins "mildly agitated" but engaged and cooperative with her.  (*Id.* at 666.)
Perkins reported he was concerned because he had missed his doctor's appointment for his medication
refills.  (*Id.*)  He also requested assistance with local food pantries.  (*Id.*)

7

That same day, Aishe Gober updated Perkins' treatment plan and noted the status as "revised with no improvement." (*Id.* at 576.)  Gober noted: "Client is living independent in RR housing . . . Client has had 3 trips to the ED in the last 6 months and was admitted once to Lutheran for 2 days." (*Id.*)

On October 30, 2018, Perkins called Haddon and canceled the appointment to go to the food pantry because of a "family emergency." (*Id.* at 667.)  About an hour later, Haddon received a call from the mother of Perkins' son, stating Perkins was threatening to come to her home and shoot her. (*Id.* at 741.)  Haddon then performed a wellness check. (*Id.* at 625.)  Haddon called Perkins and noted he was "angry, yelling and cursing on the phone." (*Id.* at 626.)  Perkins denied threatening to shoot his son's mother but admitted calling her and making threats. (*Id.*)  Perkins declined a face-to-face visit with the agency, and he also declined transportation to the emergency room for evaluation. (*Id.*)  Perkins accepted Haddon's offer to go to his phone provider to discuss his phone issue. (*Id.*)

On November 7, 2018, Haddon went to Perkins' home for a wellness check. (*Id.* at 669.)  Haddon found Perkins "extremely distressed" with open wounds on his hands. (*Id.* at 670.)  Perkins reported suicidal ideation and recent drug use because he was upset that he had missed his son's sixth birthday and that he did not have a better relationship with him. (*Id.*)  Perkins wanted to be admitted to the hospital to get better. (*Id.*)  Haddon reassured Perkins that going to the hospital would be in his best interest. (*Id.*)  Later that day, Lutheran Hospital admitted Perkins to the adult behavioral unit. (*Id.* at 742.)  Perkins remained at Lutheran Hospital until November 12, 2018. (*Id.* at 750.)  Treatment providers noted he did well while in the unit, there was no evidence of internal stimulation during assessments, and the auditory hallucinations present at admission were denied throughout his initial assessment and the remainder of his stay. (*Id.*)  Treatment providers noted Perkins was stable at discharge and planned to begin an IOP. (*Id.*)  On examination at discharge, Perkins demonstrated appropriate behavior, language, and mood, coherent and logical thought, appropriate insight and judgment, and intact memory. (*Id.* at 751.)

On November 15, 2018, Haddon took Perkins to the local food pantry.  (*Id.* at 671-72.)  Haddon noted Perkins presented as stable, was in a good mood, had linear thought processes, and did not express paranoid thoughts.  (*Id.* at 672.)  Haddon discussed the IOP with Perkins.  (*Id.*)

On December 17, 2018, Honesty King drove Perkins to the food bank.  (*Id.* at 675-76.)  King found Perkins "friendly and engaged."  (*Id.* at 676.)

On December 31, 2018, Haddon reached out to Perkins after he missed his medication management appointment.  (*Id.* at 641.)  Perkins reported he had been working and that was why he had missed his appointment.  (*Id.* at 642.)  Haddon noted Perkins had not informed the agency to cancel or reschedule his appointment and that Perkins had not yet engaged in any IOP programming as agreed.  (*Id.*)  Haddon determined Perkins presented as stable over the phone.  (*Id.*)

On January 22, 2019, Perkins called Haddon and reported he was upset because his girlfriend's husband kept showing up at her house and Perkins was afraid her husband may come to his house and do something to him.  (*Id.* at 643-44.)

Later that day, Haddon talked to a care coordinator with United Healthcare to get Perkins referred to OOD for a work assessment.  (*Id.* at 645-46.)

C.    **State Agency Reports**

On April 6, 2018, Sandra Banks, Ph.D., found moderate limitations in all four areas of the "B" criteria and determined the record evidence did not establish the presence of the "C" criteria for Listings 12.03 and 12.04.  (*Id.* at 87-88.)  Dr. Banks noted the previous ALJ's PRT was not being adopted because of changes in the listing criteria for mental health conditions.  (*Id.* at 87.)  Dr. Banks adopted the previous ALJ's mental residual functional capacity under AR 98-4.  (*Id.* at 92.)

On June 8, 2018, Jennifer Swain, Psy.D., affirmed Dr. Banks' findings.  (*Id.* at 102, 107.)

D.    **Hearing Testimony**

During the May 2, 2019 hearing, Perkins testified to the following:

- He lives on Franklin with a roommate.  (*Id.* at 42.)  He has lived there for two and a half to three years.  (*Id.*)  He washes his own dishes and does his own laundry.  (*Id.* at 43.)  He microwaves food and makes baloney sandwiches.  (*Id.* at 43.)  He takes the bus or calls his son's grandmother if he needs to go somewhere.  (*Id.*)  He tries to visit or call his mother every day.  (*Id.* at 44.)  His son's mother or his son's grandmother helps him shop.  (*Id.* at 45.)  He sees his son on the weekends.  (*Id.*)  He does not know how to use a computer.  (*Id.* at 46.)  He watches TV sometimes but does not like to watch it because there is nothing good on TV.  (*Id.*)

- He takes Risperdal and another medication that he could not remember.  (*Id.* at 47.)  The medications help him sleep and stop the voices.  (*Id.*)  As long as he stays on his medication, he does not hear voices.  (*Id.*)  He was on his medication when he started hearing voices and "flipping out" and "lashing out" when he was hospitalized.  (*Id.* at 48.)  After a death in the family, he started hearing voices and was thinking about his deceased grandmother, which set it off even with his medication.  (*Id.*)

- When he is under stress, he stays to himself.  (*Id.* at 50.)  He lashes out and cuts and hurts himself and bangs his head on things.  (*Id.*)

- Tiffany Haddon was his case manager for two and a half years.  (*Id.* at 51.)  She ensured he got to his doctor appointments and took him to get clothes and food at the food pantry.  (*Id.*)  She was no longer with Recovery Resources.  (*Id.*)  He last worked with her a few weeks ago.  (*Id.* at 52.)  Recovery Resources will be giving him a new case manager.  (*Id.*)  He was supposed to get a letter in 30 days.  (*Id.*)

- He gets along well with his roommate.  (*Id.*)  He gets along well with the people in the building, although he had an issue with someone who came toward him and his son with a knife.  (*Id.* at 53.)

- He tried to work at Amazon, but he could not do the packages.  (*Id.* at 54.)  He kept losing focus.  (*Id.*)

- Recovery Resources helps him get to appointments and his case manager talks to him about how to stay on his medication and keep himself together.  (*Id.* at 55.)  He does not talk to them every day.  (*Id.*)  Every once in a while, they check in to see how he is doing.  (*Id.*)

The VE testified Perkins had no past work.  (*Id.* at 60.)  The ALJ then posed the following hypothetical question:

> I would like you to consider a person with the same age, education and past work as the Claimant, who can occasionally lift and carry 20 pounds and

> frequently lift and carry 10 pounds, can stand and walk six hours of an eight-hour workday and can sit for six hours of an eight-hour workday, could have occasional bilateral hand controls, can never climb ladders, ropes or scaffolds and can never crawl.  Bilateral handling would be limited to frequent, bilateral fingering would be limited to occasional and bilateral feeling would be limited to frequent.  This individual must avoid concentrated exposure to extreme cold and must avoid all exposure to hazards and by that I mean, commercial driving, operating dangerous machinery and unprotected heights.  In addition, this hypothetical individual can perform simple, routine tasks consistent with unskilled work with no fast pace or high production quotas and with infrequent change, and with occasional superficial interaction with others, and by superficial, I mean of a short duration for a specific purpose.  Since there is no past work, would there be any jobs for such a hypothetical individual?

(*Id.* at 60-61.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as cafeteria attendant, cleaner, and bakery worker.  (*Id.*)

The ALJ modified the hypothetical to add a limitation to low-stress work, meaning no arbitration, negotiation, responsibility for the safety of others, and/or supervisory responsibility.  (*Id.* at 61-62.)  The VE testified the same jobs would remain at the same numbers.  (*Id.* at 62.)

### III.  STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that

11

"significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since January 22, 2018, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: neuropathy, status-post frostbite of fingers and schizoaffective disorder, bipolar type (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; can stand and walk six hours in an eight-hour workday; can sit six hours in an eight-hour workday; occasional bilateral hand controls; never climb ladders, ropes or scaffolds; never crawl; bilateral handling limited to frequent; bilateral fingering limited to occasional; bilateral feeling limited to frequent; avoid concentrated exposure to extreme cold; avoid all exposure to hazards, including commercial driving, operating, [sic] dangerous machinery and unprotected heights; can perform simple, routine tasks, consistent with unskilled work, with no fast pace, or high production quotas, and with infrequent change; with occasional superficial interactions (meaning of the short

duration for a specific purpose) with others; and can perform low stress work, meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on June **, 1977 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since January 22, 2018, the date the application was filed (20 CFR 416.920(g)).

(Tr. 18-29.)

## V.      STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

13

credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

14

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Perkins argues the ALJ erred at Step Three when she failed "to consider the extraordinary support [he] received in order to achieve his minimal function under 12.03 and 12.04(C) . . . ." (Doc. No. 14 at 19.)  Perkins further argues the ALJ mischaracterized his living arrangements and ignored evidence regarding his difficulty in getting along with others. (*Id.* at 21-22.)  Perkins asserts the ALJ's Step Three findings regarding the "C" criteria were "contradicted by the ALJ's own findings and was not based on the record as a whole." (*Id.* at 22-23.)

The Commissioner argues substantial evidence supports the ALJ's Step Three finding and that Perkins has failed to meet his burden to prove that he met or equaled Listings 12.03 or 12.04 or show the ALJ erred in her analysis. (Doc. No. 16 at 10, 13.)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. § 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at 416-17.  *See also Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 F. App'x at 416; *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 311 (6th Cir. July 13, 2018) (same)).  *See also Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge

16

between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 5:12CV1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug.29, 2013)).

At Step Two, the ALJ found that Perkins' schizoaffective disorder constituted a severe impairment. (Tr. 18.) At Step Three, the ALJ expressly stated that she considered Listings 12.03 and 12.04 and addressed the paragraph B and C criteria for those listings as follows:

> The severity of the claimant's mental impairment does not meet or medically equal the criteria of listings 12.03 and 12.04. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.
>
> *In understanding, remembering, or applying information, the claimant has moderate limitations.* The claimant alleged that he has difficulty following instructions, completing tasks, and driving. During the hearing, the undersigned notes that he could not recall the names of one of his medications, and did not know the ZIP Code for his residence. However, the claimant also stated that he could prepare meals, go to doctor's appointments, take medications, and take public transportation. (Hearing testimony). In addition, the record shows that the claimant was able to provide information about his health and mental status examinations describe him as having intact short-and long-term memory. (B4F/6, 11)
>
> *In interacting with others, the claimant has moderate limitations.* Here, the claimant alleged that he has difficulty getting along with others and spending time in crowds. However, according to his statements, the claimant is also able to spend time with friends and family, take public transportation, and live with others. He said that he visits his mother several times during each week, and said he has a good relationship with her. (Hearing testimony). Finally, the medical evidence shows that the claimant was described as cooperative during most of his appointments. Mental status examinations and progress notes contain mention of the claimant's reports of suspiciousness regarding his neighbors, and interpersonal conflicts with his child's mother. Case management notes also show that the claimant was experiencing some paranoia in the setting of the food pantry, around crowds of people. (B8F/72, 121, 128)
>
> *The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has moderate*

17

*limitations.*  At the hearing, the claimant testified that he has difficulty concentrating and focusing.  However, he said that he is able to perform household chores, bathe, and dress.  He said that he "cuts off TV," because he finds violence stressful.  (Hearing testimony).  Mental status examinations describe the claimant as having "normal concentration and attention" and being alert and oriented.  Treatment records also specified that the claimant is not experience [sic] a high degree of sedation from his medication (B4F/6, 11, 63; B7F/14; B9F/5).

*Finally, the claimant has moderate limitations in his ability to adapt or manage himself.*  The claimant asserted that he has difficulties managing his mood.  That said, the claimant also stated that he is able to handle self-care and personal hygiene.  (Hearing testimony)  Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, but intermittent difficulties in regulating his emotions and maintaining medication compliance.  The claimant experienced two brief psychiatric hospitalizations during the period of time under consideration in this claim, both in the context of poor medication compliance, and difficulty handling life stressors.  In both cases, his psychotic symptoms abated quickly during inpatient treatment, and he was discharged back to his own apartment.  (B8F/73, 81, 113; B9F/2).

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria were satisfied when evaluating whether any of the claimant's mental impairments met the requirements of any listed impairment.  The "paragraph C" criteria are an alternative to the "paragraph B" criteria, used to evaluate some of the listed mental disorders that are "serious and persistent."  A mental impairment is considered "serious and persistent" when there is a documented history of the existence of the mental disorder over a period of at least two years, with findings that the individual meets both of two additional requirements:

> (1) evidence shows that the disorder causes an individual to rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial supports, or a highly structured setting(s) to diminish the symptoms and signs of the individual's mental disorder; and

> (2) evidence shows that the individual has achieved only "marginal adjustment," meaning that the individual's adaptation to the requirements of daily life is fragile and the individual has minimal capacity to adapt to changes in their environment or to demands that are not already part of their daily life.

> The above records show that the claimant does rely on mental health treatment, including psychotropic medication and assistance from case managers to get to his treatment appointments and maintain compliance with medication. However, the claimant has lived independently in an apartment, and reports that he generally gets along well with his roommate and other residents in the apartment building. He is able to take public transportation to visit family members, prepares simple meals for himself, and maintains his personal care without undue reliance on mental health workers or others. The claimant does require occasional reminders from his mental health workers to attend his medication management appointments and take his medication as prescribed, but overall, the record demonstrates that the claimant generally maintains medication compliance, and is able to handle the stressors of daily life adequately. Therefore, the "paragraph C" criteria are not met.

(Tr. 19-20.)

The Paragraph C criteria are used to evaluate "serious and persistent" mental disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Paragraph C criteria are intended to recognize that mental health treatment may control the more obvious symptoms and signs of the claimant's mental disorder. *Id.* To satisfy the Paragraph C criteria, the evidence must show: (1) the claimant relies on ongoing medical treatment, therapy, psychosocial supports, or a highly structured setting to diminish the symptoms of the mental disorder; and (2) the claimant is able to obtain only "marginal adjustment" even when the above supports diminish the claimant's mental disorder symptoms. *Id.* Listing 12.00(G) defines "marginal adjustment" as the claimant has minimal capacity to adapt to changes in environment, has deterioration in functioning, and may be unable to function outside of the home or supportive setting. *Id.* Evidence may also show this deterioration has resulted in significant changes in medication, absence from work, or hospitalization. *Id.*

The ALJ's Step Three analysis is supported by substantial evidence through June 8, 2018, the date of the state agency reviewing psychologist's determination on reconsideration that the Paragraph C criteria were not met. (Tr. 102.) However, the state agency reviewing psychologists did not have the benefit of additional records in 2018, including Perkins' hospitalizations in August and November, and as the ALJ recognized, Perkins' condition deteriorated later in 2018. (*Id.* at 24.) In her analysis of the Paragraph C

19

criteria, the ALJ failed to mention that Perkins lived in supportive housing through Recovery Resources. (*Id.* at 20.)  The ALJ also failed to mention that notwithstanding Perkins' testimony that he generally gets along with others in his building, the record documents several incidents with his former roommate and other residents.  (*Id.* at 437, 444-46, 609-10, 654.)  Most importantly, while the ALJ states the record "demonstrates that [Perkins] generally maintains medication compliance, and is able to handle the stressors of daily life adequately," the ALJ fails to explain how she made such a determination when, even living in supportive housing, Perkins struggled to maintain medication compliance, threatened to kill his son's mother, and called the Mobile Crisis unit after walking barefoot down East 91st Street, carrying his shoes, reporting hearing voices, and yelling at other people on the street.  (*Id.* at 407-13, 427-48, 615-16, 625-26, 737, 741, 747.)  Therefore, the ALJ failed to build an accurate and logical bridge between the evidence and her conclusions for the relevant time period after June 8, 2018.

Nor can reading the decision as a whole save the deficiencies in the ALJ's Step Three analysis. Earlier in her Step Three analysis, in analyzing the Paragraph B criteria, the ALJ acknowledged that Perkins was hospitalized twice during the relevant period "*both in the context of poor medication compliance, and difficulty handling life stressors.*"  (Tr. 20) (emphasis added).  While the ALJ determined in both hospitalizations Perkins' symptoms "abated quickly" with inpatient treatment and he was discharged back to his own apartment, it is disingenuous at best, without more, for the ALJ to say three paragraphs later that the record shows Perkins generally maintained medication compliance and could handle life stressors adequately, notwithstanding two hospitalizations in less than six months while living in supportive housing through Recovery Resources.  In the RFC analysis, the ALJ found that Perkins needed "frequent" reminders from his case manager regarding his appointments and taking his medication regularly, notwithstanding having found at Step Three that he only needed "occasional reminders" from Recovery Resources staff regarding appointments and medication compliance at Step Three.  (*Id.* at 20,

20

23-24.)   In addition, the ALJ recognized that Perkins' condition deteriorated in October 2018 before his second hospitalization in November 2018.  (*Id.* at 24.)  These findings, without explanation from the ALJ otherwise, undercut the ALJ's findings regarding the Paragraph C criteria at Step Three.

For the period after June 8, 2018, the ALJ's analysis does not provide the "accurate and logical bridge" necessary for this Court to conduct a meaningful review of the ALJ's decision.  The ALJ's failure to follow applicable procedures has deprived Perkins of substantial rights, requiring that the ALJ's determination be reversed.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED IN PART AND VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION IN PART.

**IT IS SO ORDERED.**

Dated: September 8, 2021

  *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge